**EXHIBIT A**
**VERIFICATION AND AFFIDAVIT IN SUPPORT OF COMPLAINT**

I, Mark Salloum, hereinafter referred to as the Affiant, being duly sworn, depose and state as follows:

## INTRODUCTION

1.  Your Affiant is a HSI Special Agent (SA), assigned to the Resident Agent in Charge (RAC) in Cincinnati, Ohio. I have been employed with HSI as a SA since August, 2008. I graduated from the University of Akron, Akron, Ohio in August of 2000 with a Bachelor's Degree in Education, and a Bachelor's Degree in History in May of 2001. I completed my graduate studies at Cleveland State University, Cleveland, Ohio in December of 2002, with a Master's Degree in History. As part of my duties as an HSI SA, I investigate criminal violations of U.S. Customs and Immigration laws to include violations of the Immigration and Nationality Act (INA), I also conduct inquiries related to alienage and removability of aliens present in the United States. In addition, I am a graduate of the Federal Law Enforcement Training Center (FLETC) Criminal Investigator Training Program (CITP), and Immigration and Customs Enforcement Special Agent Training (ICE-SAT), where I received training relative to conspiracy investigations, identity theft and benefit fraud investigations, smuggling investigations, confidential source handling, drug identification, federal drug law, and various surveillance and investigative techniques.

## VERIFICATION OF COMPLAINT

2.  Affiant makes this affidavit in support of a Complaint for Forfeiture of the following Defendants:

    One. Account #******4080, GE Capital Bank, In the name of Wilson BARANGIRANA, Contents in the amount of $200,452.94;

    Two. Account #******6203, Wright Patt Credit Union, In the name of Wilson BARANGIRANA, Contents in the amount of $54,796.94 (Defendants One and Two are hereinafter referred to as the BANK ACCOUNTS); and

    Three. $4,700.00 U.S. Currency.

3.  I have carefully read the Verified Complaint for Forfeiture to which this Affidavit is attached and hereby verify that the facts stated therein are true and correct.

## FUNGIBLE PROPERTY

4.  Based on my training and experience, I know that Title 18, U.S.C. § 984 (a) provides:

    (1) In any forfeiture action in rem in which the subject property is cash [or] funds deposited in an account in a financial institution...

1

(A)   it shall not be necessary for the Government to identify the specific property involved in the offense that is the basis for the forfeiture; and

(B) it shall not be a defense that the property involved in such an offense has been removed and replaced by identical property.

(2)   Except as provided in subsection (b), any identical property found in the same place or account as the property involved in the offense that is the basis for the forfeiture shall be subject to forfeiture under this section.

5.   I know that, in essence, Section 984 allows the United States to seize for civil forfeiture identical property found in the same place where the "guilty" property had been kept.   See United States v. All Funds Presently on Deposit at American Express Bank, 832 F. Supp. 542, 558 (E.D.N.Y. 1993).   I am advised that by Section 984 (a)(1)(b) as long as forfeiture is sought for funds on deposit in that same account that the dirty funds were transferred into, that direct tracing of the funds is not required.

6.   I further know that the "fungibility" rule of Section 984(b) cannot reach back in time for an unlimited period.   Section 984 (b) provides:

No action pursuant to this section to forfeit property not traceable directly to the offense that is the basis for the forfeiture may be commenced more than 1 year from the date of the offense.

7.   I know that, thus, Section 984 applies so long as the "action" to forfeit the property is commenced within one year from the date of the offense giving the basis for the forfeiture.

## BASIS FOR FORFEITURE

8.   Based on my training and experience, as detailed above, I believe that there is probable cause to believe that Wilson BARANGIRANA has committed the following violations:

a.   18 USC § 1028 (Fraud and Related Activity in Connection with Identification Documents, Authentication Features, and Information),
b.   18 U.S.C. § 1028A (Aggravated Identity Theft),
c.   18 U.S.C. § 1029(Fraud in Connection with Access Devices),
d.   18 U.S.C. § 1343 (Fraud by Wire, Radio, or Television)
e.   18 U.S.C. § 1956 (Money Laundering),
f.   18 U.S.C. § 1957 (SUA Money Spending), and
g.   18 U.S.C. § 371 (Conspiracy);

9.   The dates of the offenses giving rise to the seizure are within one year of the Seizure of the Defendants. Thus, Section 984 makes the contents of the BANK ACCOUNTS subject to forfeiture without tracing because $200,452.94 was deposited into the GE Capital Acct# 4080 within the past year and $86,211.00 was deposited into the WPCU Acct #6203 within the last year.

2

10.   Further, based upon the information below, it is my opinion that the Defendants are subject to forfeiture to the United States pursuant to:

>   a.   18 U.S.C. § 981(a)(1)(C) as the Defendants constitute or are derived from proceeds traceable to a violation of 18 USC § 1028 (Fraud and Related Activity in Connection with Identification Documents, Authentication Features, and Information), 18 U.S.C. § 1028A (Aggravated Identity Theft), 18 U.S.C. §1029 (Fraud in Connection with Access Devices); or a violation of a specified unlawful activity including, 18 U.S.C. § 1956 (Money Laundering), 18 U.S.C. § 1957 (Engaging in Monetary Transactions in Property Derived from Specified Unlawful Activity), 18 U.S.C. § 1343 (Fraud by Wire, Radio or Television), or are derived from proceeds traceable to a conspiracy to commit such offense; and/or

>   b.   18 U.S.C. § 981(a)(1)(A) as the Defendants were involved in a violation of 18 U.S.C. § 1956 (Laundering of Monetary Instruments), and 18 U.S.C. § 1957 (Engaging in Monetary Transactions in Property Derived from Specified Unlawful Activity).

11.   This Affidavit does not purport to set forth all of my knowledge of, or investigation into, this matter. The facts and information contained in this affidavit are based on my personal knowledge, my training and experience, and my discussion with various witnesses, including other law enforcement agents who are familiar with the investigation, along with other public sources of information. Your Affiant conferred with other officers who are experienced in the area of enforcing laws relating to Title 18 United States Code 1029 (Fraud and Related Activity in Connection with Access Devices); Title 18 United States Code 1956 (Laundering of Monetary Instruments); Title 18 United States Code 1343 (Fraud by Wire, Radio, or Television).

12.   In May of 2013, HSI Cincinnati received information from the Montgomery County Sheriff's Office (MCSO) that WILSON BARANGIRANA, a citizen/national of Rwanda, is involved in Fraud and Related Activity in Connection with Access Devices.

13.   After receiving this information, your Affiant conducted record checks on BARANGIRANA, which yielded the following results:

| | |
|---|---|
| Name: | WILSON BARANGIRANA |
| Date of Birth: | September   **, **** |
| Social Security Number: | ***-**-**** |
| Alien Number: | ***-***-*** |
| Citizen/National: | Rwanda |
| | |
| Address: | **** Piper Lane, Unit 205, Centerville, OH 45458 |
| Phone Number: | (937) 626-**** |

14.   BARANGIRANA, a citizen/national of Rwanda, entered the United States on or about December 30, 2005 on an F1 Student Visa, to attend Sinclair Community College, in Dayton, OH. BARANGIRANA completed his education program on/about December of 2008.   TECS Records indicate that BARANGIRANA is an Overstay Alien, in violation of the Immigration and

3

Nationality Act (INA).   On July 30, 2012, BARANGIRANA was issued a Notice to Appear (NTA) in immigration court.

15.   On May 8, 2013, MCSO encountered BARANGIRANA and Gregory COOPER in the parking lot of a Speedway Gas Station.   During this encounter, COOPER had a bag full of brand new cell phones in his possession, and BARANGIRANA had $3,176.00 on his person, and an additional $4,000.00 in his vehicle.

16.   During a subsequent interview with MCSO, BARANGIRANA stated that he sells new and used cellular phones for profit via eBay under the business name of "SAVERSVILLE." BARANGIRANA stated that SAVERSVILLE is not an LLC; he is a sole proprietor and files taxes in that manner.   BARANGIRANA stated that he has previously purchased cell phones from COOPER on three occasions.   BARANGIRANA further stated that the phones he just purchased from COOPER were purchased for $300.00 per phone, and that he resells them for $380.00 per phone.

17.   During a subsequent interview with Detective Hemingway of the MCSO, COOPER stated that he met BARANGIRANA via craigslist through an ad for a job. COOPER stated that he was offered a job with BARANGIRANA's cell phone business, which he accepted.   COOPER stated that BARANGIRANA calls him on the phone and gives him unknown persons' identifying information (names, social security numbers, dates of birth, and account numbers). COOPER stated that he is directed by BARANGIRANA to go to Sam's Club or Best Buy with the information and obtain upgrades for the person for whom he has been given identifying information.   COOPER stated that BARANGIRAN directs him to purchase specific phones and deliver the phones to BARANGIRANA.   During initial contact with COOPER, MCSO located a spiral notebook containing several pages with names, social security numbers, dates of birth, and account numbers written in COOPER's handwriting.

18.   As a result of the May 8, 2013, encounter with BARANGIRANA and COOPER, MCSO seized $7,176.00 in US currency, along with approximately 18 cellphone, and one ledger.

19.   Your Affiant obtained data from Sprint that verified that for 32 of the stolen identities (names and social security numbers) listed in the ledger seized from COOPER, phones were purchased in those names.

20.   Your Affiant also verified that for 14 of the approximately 18 phones seized from BARANGIRANA and COOPER, 14 phones were directly linked to 8 of the 32 stolen identities listed in the ledger.   Those 14 phones are as follows:

a.   Two phones with serial numbers **256691415009797747** and **256691415009797977,** seized from COOPER'S vehicle were registered to "J.S." whose name and social security number were found on the ledger.

b.   Two phones with serial numbers **256691415001410921** and **256691415001444152** seized from COOPERS's vehicle were registered to "D.G." whose name and social security number were found on the ledger. "D.G.'s" account was upgraded at the Best Buy

4

Store 368 (1770 Apple Glen Ave., Fort Wayne, IN 46804) on April 16, 2013 7:30 PM and his phone numbers were reassigned to the above phones seized from COOPER's vehicle.

c.   A phone with serial number **256691415009799202** seized from COOPER's vehicle was registered to "K.S." whose name and social security number were found on the ledger. "K.S.'s" account was upgraded by phone on May 6, 2013 10:54 PM and his phone number was reassigned to the above phone found in COOPER's vehicle.

d.   Two phones with serial numbers **256691415001270679** and **256691415009521513** seized from COOPER's vehicle were registered to "T.R." whose name and social security number were found on the ledger. "T.R.s" account was upgraded on April 15, 2013 8:56 PM at the Best Buy Mobile store 1096, located at 1632 Stringtown Rd., Grove City, OH 43123 and his phone numbers were reassigned to the above phones seized from COOPER'S vehicle.

e.   A phone with serial number **256691457602299777** seized from COOPER's vehicle was registered to "S.M." whose name and social security number were found on the ledger. "S.M.'s" account was upgraded by phone on April 26, 2013 4:58 PM and his phone number was to the above phone found in COOPER's vehicle.

f.    Two phones with serial numbers **256691414908745267** and **256691415003629106** seized from COOPER's vehicle were registered to "A.H." whose name and social security number were found on the ledger. "A.H.'s" two phones on his account were upgraded by phone on 5/8/2013 2:25 PM and reassigned to the above phones seized from COOPER's vehicle.

g.   Two phones with serial numbers **256691487003306377** and **256691487003618152** seized from COOPER's vehicle were registered to "T.B." whose name and social security number were found on the ledger. "T.B.'s" two phones on his account were upgraded by phone on May 1, 2013 8:30 PM and reassigned to the above phones seized from COOPER's vehicle.

h.   Two phones with serial numbers **256691415001409605** and **256691415009468211** seized from COOPER's vehicle were registered to "J.R." whose name and social security number were found on the ledger. "J.R.'s" two phones on his account were upgraded on April 17, 2013 11:00 PM, although a previous attempt to modify the account had been made earlier in the day at Best Buy Store 266, located at 2907 Centre Dr., Fairborn, OH, and were reassigned to the above phones seized from COOPER's vehicle.

21.  On September 9, 2013, your Affiant received information from Englewood Police Department (EPD) Detective David Collins that 19 cellular phones had been stolen from Russell Cellular, located at 7722 Hoke Road, Englewood, OH 45322.  The EPD report dated May 28, 2013, states that the Manager reported the theft of 19 cellular phones, valued at $9,399.81. Cohen

provided the tracking number/ESN and description for each of the 19 phones, which are listed below:

1.  A0000040A8E0B6,    SAM 380 Brightside
2.  990002043718756,    SAM 405 Stratosphere 4G
3.  990002062398993,    SAM 405 Stratosphere 4G
4.  990002112746548,    SAM 605 Galaxy Note 2 White
5.  990002043614096,    SAM 405 Stratosphere 4G
6.  990002112761620,    SAM 605 Galaxy Note 2 White
7.  A10000338DDD84,    Apple I-Phone 4 8GB WHT
8.  990002043659631,    SAM 405 Stratosphere 4G
9.  990002005772783,    MOT 912 Razr Maxx 32GB
10. 990003336030644,    SAM Galaxy S III White 16GB 4G
11. 990002097847675,     SAM Galaxy S III Black 16GB 4G
12. 990002043557758,    SAM 405 Stratosphere 4G
13. 990002460511767,    MOT 907 Droid RAZR M 8GB Black 4G
14. 990003336082611,    SAM Galaxy S III White 16GB 4G
15. 990001133848119,    SAM 405 Stratosphere 4G
16. 990002460863499,    MOT 907 Droid RAZR M 8GB Black 4G
17. 99000266206227,    Apple I-Phone 4S 16GB WHT
18. 990002755190616,    Apple I-Phone 5 16GB BLK 4G
19. 990002758017196,    Apple I-Phone 5 16GB WHT 4g

22.   Verizon Wireless provided information that 14 of the 19 stolen phones were currently active on the Verizon network.   Detective Collins was able to reach two of the purchasers of these stolen phones and learned that the phones had been purchased on eBay from a business called SAVERSVILLE, a business operated by WILSON BARANGIRANA.

    a.   One of the stolen phones was activated on April 26, 2013, and the telephone was registered to "B.C."   Detective Collins called "B.C." and he stated that he purchased the phone on eBay from a seller using the ID name "SAVERSVILLE".   "B.C." stated he paid $189.00 for the phone and received it in the mail. Shipping forms provided to Det. Collins by "B.C." indicate the shipment originated in Dayton, OH. A review of SAVERSVILLE's PayPal account indicates that on April 20, 2013, SAVERSVILLE received $189.00 (less transaction fee) from "B.C." for the phone.

    b.   Another one of the stolen phones was activated and the phone was registered to "D.H." who advised Detective Collins that he purchased the phone on eBay from "SAVERSVILLE."   "D.H." stated he paid $535.00 for the phone. A review of SAVERSVILLE's PayPal account indicates that on March 17, 2013, SAVERSVILLE received $619.00 (less transaction fee) from "D.H." for the phone.

23.   eBay is the world's largest online marketplace (www.ebay.com), where practically anyone can buy and sell practically anything.   Founded in 1995, eBay connects a diverse and passionate community of individual buyers and sellers, as well as small businesses.   eBay functions as an on online market/auction location where items are displayed for a set period of time.   During this time, any user can bid on the item over the Internet. The current high bid, and bid history, is

6

constantly updated and displayed. Bidding is by proxy (the system will place minimum bids for you until the reserve is met, or your maximum bid is reached or exceeded by another bidder). Bidding is often intense (mobile notifications, sniping). At a designated moment, the sale ends, and the high bidder and seller contact each other, and arrange details. The buyer sends payment by PayPal, credit card, money order, check, or some other safe payment method to the seller. Upon receiving money, seller sends goods. Buyer and seller "grade" each other on the transaction in the feedback forum.

24. PayPal is a convenient, easy-to-use and secure way for individuals and businesses to send and receive money online for goods, services, charitable donations, and so on. With more than 87 million active registered accounts worldwide, PayPal has made it possible for people to pay and get paid online across different locations, currencies, and languages. Responding to the eBay community, which had quickly adopted PayPal as its preferred payment method, eBay Inc. acquired the company in 2002. Today, PayPal is available in 190 markets, 24 currencies, and is accepted by millions of online merchants around the world.

25. PayPal is an account-based service that allows customers to send and receive money using their credit card, bank account, or a PayPal balance. Account holders use PayPal to electronically send money to eBay merchants, other internet merchants or friends and relatives. In order to initiate a payment, the customer must log into his account, enter the email address of the recipient, currency and amount, and select the funding option. After the payment is completed, PayPal immediately sends an email notification to both the sender and recipient of the payment. The recipient can; Keep the funds in their PayPal account; Send the funds to another PayPal account; Transfer the funds to a bank account

26. On September 9, 2013, your Affiant received the following information from eBay/Paypal related to the account owner for "SAVERSVILLE":

| | |
|---|---|
| USER ID: | SAVERSVILLE |
| FULL NAME: | WILSON BARANGIRANA |
| EMAIL ADDRESS: | barangi06@gmail.com |
| CONTACT INFO: | Wilson BARANGIRANA, **** Piper Lane, Apt 205, Centerville, OH 45440, US 937 626 **** |
| SHIPPING ADDRESS: | Wilson BARANGIRANA, **** Piper Lane, Apt 205, Centerville, OH |
| PHONE: | 937-626-**** |
| DATE OF BIRTH: | September **, **** |
| REGISTRATION DATE: | Wed, 02 May 2007 7:35:46 |
| REGISTRATION COUNTRY: | United States |
| REGISTRATION IP: | **.**.**6.152 |
| CONTACT INFO HISTORY: | From November 26, 2012 to the present, Wilson BARANGIRANA, **** Piper Lane, Apt 205, Centerville, OH 45440, US 937-626-**** |
| SHIPPING ADDRESS HISTORY: | As of August 21, 2013, Wilson BARANGIRANA, **** Piper Lane, Apt 205, Centerville, OH 45440, US 937-626-**** |

27.   From August 21, 2012 – August 21, 2013, SAVERSVILLE listed approximately 1645 items for sale on eBay.   The majority of the items for sale were electronic devices such as tablets and smart phones, including but not limited to: Android Droid Smart Phone; I-Phone 4 Smart Phone; I-Phone 4S Smart Phone; I-Phone 5 Smart Phone; I-Pad 3 Tablet; Blackberry Bold 9930; HTC One X; Samsung Galaxy Note 2; Samsung Galaxy S II Smartphone; Samsung Galaxy S3 smart phone).   The approximate total asking price for all the merchandise for sale from August 21, 2012 to August 21, 2013 was $470,340.50.

28.   WILSON BARANGIRANA uses PayPal to sell items on SAVERSVILLE.   Information obtained from PayPal indicates that WILSON BARANGIRAN had as many as 5 PayPal accounts at one time, but currently SAVERSVILLE has only one active PayPal account which includes the following account registration information:

| | |
|---|---|
| FIRST NAME: | WILSON |
| LAST NAME: | BARANGIRANA |
| DOB: | **-Sep-** |
| CC STATEMENT NAME: | SAVERSVILLE |
| EMAIL: | barangi-06@hotmail.com, barangi06@gmail.com |
| BUSNIESS NAME: | SAVERSVILLE |
| ACCOUNT STATUS: | Open |
| ACCOUNT #: | ***************3786 |
| ACCOUNT TYPE: | Business – Verified – Cat10C |
| SSN: | ***-**-**** |
| ADDRESS: | **** Piper Lane, Apt 205, Centerville, OH 45440, a second address used is P.O.BOX ***** Dayton, OH 45406 |
| PHONE NUMBER: | 937-626-**** |

29.   Information obtained from PayPal indicates that between opening the account and August 2013, the total amount received into the SAVERSVILLE PayPal Account #3786 was $1,853,062.01.   Between August 2012 and August 2013 over $900,000.00 was received into the PayPal Account #3786.

30.   Your Affiant has determined that the money that goes into SAVERSVILLE'S PayPal Account #3786 gets transferred into other accounts owned by WILSON BARANGIRANA including the Defendant Bank Account #******4080, GE Capital Bank and Defendant Bank Account #******6203, Wright Patt Credit Union, hereinafter collectively "BANK ACCOUNTS". A brief summary of the transfer of the money from SAVERSVILLE'S PayPal Account #3786 into the BANK ACCOUNTS is further described below and is generally depicted in the attached chart labeled as Exhibit 1.

31.   Earlier on in the scheme, transfers were made out of PayPal Acct #3786 into the following PNC Accounts opened by WILSON BARAGIRANA:

    a. PNC Bank Acct#***7849 in the name of WILSON BARANGIRANA; and
    b. PNC Acct #****4333 in the names of WILSON BARANGIRANA and DIDACE NTAKIRUTIMANA formerly known as National City Bank Acct#*****5509 before PNC bought out National City Bank.

8

32.  PNC Accounts #7849/#5509 and 4333 are no longer tied to PayPal Acct #3786. Prior to the accounts becoming inactive, at least $120,000.00 was transferred into the PNC accounts from the PayPal #3786 account. Then $26,515.69 was transferred out of the PNC Account and deposited into WPCU #1718. The United States is not seeking the seizure of the WPCU Acct #1718 because as of January 21, 2014, there was only approximately $3,360.00 remaining in the account. The amount of $50,000.00 was transferred into JPMorgan Chase Acct #7111 described below.

33.  After PNC notified BARANGIRANA that they were shutting down his PNC accounts, on April 5, 2013, BARANGIRANA opened the following JP Morgan Chase Accounts, all of which have him as the sole signor on the accounts:

a. JP Morgan Chase Bank Acct#****8739 in the name of WILSON BARANGIRANA From April 10, 2013, through October 24, 2013, the amount of $340,495.02 was transferred from PayPal Account #3786 into this account. The amount of $80,000.00 was transferred from this account into JP Morgan Chase Acct #0761.

b. JP Morgan Chase Bank Acct#****7111 in the name of WILSON BARANGIRANA The amount of $50,000.00 was transferred into this account from the PNC account listed above.

c. JP Morgan Chase Bank Acct#****5139 in the name of WILSON BARANGIRANA The amount of $30,000.00 was transferred into this account from the JP Morgan Chase Acct #7111 listed above.

d. JP Morgan Chase Bank Acct#****0761 in the name of WILSON BARANGIRANA The amount of $80,000.00 was transferred into this account form the JP Morgan Chase Acct #8739.   The amount of $19,000.00 was transferred into this account from JP Morgan Chase Acct #7111.   The amount of $40,000.00 was transferred into this account from JP Morgan Chase Account #5139.

**THE DEFENDANTS**

**DEFENDANT 1:**
**GE Capital Bank Acct#********4080 in the name of WILSON BARANGIRANA**

34.  BARANGIRANA opened GE Capital Bank Acct #4080 online via acceptance of an e-sign agreement. As of December 31, 2013 a total of $147,319.33 was transferred from PayPal Acct #3786 into this account. On September 30, 2013, $75,000.00 was transferred from JPMorgan Chase Acct #0761 into GE Capital Bank Acct #4080.   On October 10, 2013, $70,000.00 was transferred from JPMorgan Chase Acct #0761 into GE Capital Bank Acct #4080.   On October 25, 2013, $2,319.99 was transferred from JPMorgan Chase Acct #0761 into GE Capital Bank Acct #4080. As noted above, the money contained in JPMorgan Chase Acct #0761 all came from transferred out of the PayPal Acct #3786.   As of December 31, 2013, the balance in this account was approximately $147,640.60.

35.   On January 22, 2014 a federal seizure warrant was issued for the contents of the account.

36.   At the time the seizure warrant was executed, there was $200,452.94 in the account. The seizure warrant was executed on January 22, 2014 and the Defendant $200,452.94 was seized. Since the seizure, Your Affiant's investigation shows that on or about January 14, 2014 the amount of $56,041.00 was transferred from WPCU Account #***1718 into GE Capital Bank Account # ***4080.  This transfer is portrayed in Exhibit 1. Your Affiant is currently investigating the source of the $52,681.00 transferred into WPCU Account #1718. At least $26,515.69 has already been traced back to the SAVERSVILLE PAY PAL ACCOUNT as illustrated in Exhibit 1.

37.   On March 13, 2014, HSI received an administrative claim to Defendant 1 from BARANGIRANA.   In his claim, BARANGIRANA states that Defendant 1 is "…my personal savings over all my working career.   Includes money borrowed from other people.   There was absolutely no illigal (SIC) activity in obtaining the funds."

**DEFENDANT 2:**
**Wright-Patt Credit Union Acct #***6203 in the name of WILSON BARANGIRANA**

38.   BARANGIRANA opened this account on June 3, 2013 as a business account for SAVERSVILLE.   BARANGIRANA listed the business type as "Sole Proprietor" and used his Social Security number as his Tax Identification Number.   In opening the account, WILSON BARANGIRANA provided a signed letter to WPCU that stated the following:

> My name is Wilson BARANGIRANA Social security number ***-**-****.  I am writing to request to open a Business Checking Account with Wright Patt Credit Union. I have been with Wright Patt for more than 3 years. I have an online business on eBay, the store's name is Saversville, I sell electronics,  mostly things like Cell phones, ipads and occasionally laptops. I get paid through PayPal and I then  transfer the money to my business checking account. I have been selling on eBay since 2007 but fulltime since 2011. My net income for 2012 was 58,000$. My accountant is Pam Gillet with P&R accounting services LLC, 945  E Central Ave, Miamisburg, OH 45432 Thank you very much in advance, it is my hope that  our relationship  will continue  to be excellent as it always has bee. (SIC)"

39.   An analysis of the WPCU Acct #6203 conducted by your Affiant and Internal Revenue Service (IRS) Special Agent Laurel Vant indicates that BARANGIRANA opened the account with a deposit of $100.00.   From June 3, 2013, through October 31, 2013, there were 10 separate transfers of money from PayPal Acct #3786 directly into this account for a total of $86, 211.00.

40.   On January 22, 2014 a federal seizure warrant was issued for the contents of the account. The seizure warrant was executed on January 22, 2014 and the Defendant $54,796.94 was seized.

41.   On March 13, 2014, HSI received an administrative claim to Defendant 2 from BARANGIRANA.   In his claim, BARANGIRANA states that Defendant 2 "… is my personal money legally obtained from selling items online."

**DEFENDANT 3:**
**$4,700.00 U.S. Currency**

42.    On January 22, 2014 a federal search warrant was issued for BARANGIRANA's residence located on Piper Lane, Centerville, Ohio.   The search warrant was executed on January 23, 2014 and during that search, the sum of $4,700.00 was located within the residence.

43.   On March 13, 2014, HSI received an administrative claim to Defendant 3 from BARANGIRANA.   In his claim, BARANGIRANA states that Defendant 3 and other smart phones, tablets and computers seized from his residence "… are legally obtained from different parties, some of them are for personal use. IPAD, Macbook, HP Laptop.   I can provide proof of purchase if necessary.   There was no illegal activity in obtaining this (SIC) objects."

## THE SEARCH

44.   The search of BARANGIRANA'S residence occurred pursuant to a federal search warrant which was executed on January 23, 2014 by HSI Special Agents, with the assistance of the Internal Revenue Service (IRS), Montgomery County Sheriff's Office (MCSO), Englewood Police Department (EPD), and the Centerville Police Department (CPD).   Items seized during the search include but are not limited to the following:
   a.   two (2) New Lenovo Ideapads;
   b.   two (2) Samsung Galaxy Note devices; and
   c.   dozens of SIM cards, which were located throughout the residence.

## SEIZED ITEMS THAT WERE FRADULENT

45.   Prior to executing the aforementioned search warrant, your Affiant viewed the SAVERSVILLE account via eBay.   Your Affiant noted that there were approximately 10 items for sale.   One of the items for sale was a "New Lenovo Ideapad."   Your Affiant also noted that SAVERSVILLE was advertising one "Samsung Galaxy Note" for sale.   As noted above, during the execution of the search warrant, two (2) Lenovo Ideapads and two (2) Samsung Galaxy Note devices were seized.

46.   In March 2014, your Affiant contacted Lenovo Customer Support.   Your Affiant provided the two serial numbers of the Lenovo Ideapads seized from BARANGIRANA which were SN: **YB00244784** and SN: **YB00244792**.   Your Affiant learned that both Lenovo computers were purchased in one order.   However, the customer had called in and said that he didn't order the computers and that someone used his identity to purchase the computers.

47.   In May 2014, your Affiant contacted T-Mobile. Your Affiant provided the IMEI numbers of the two Samsung Galaxy Note devices seized from BARANGIRANA which were IMEI: **357518053386579** and IMEI: **357518053410924**.   T-Mobile confirmed that both phones had bad ESNs and were blocked for non-payment.   A bad ESN is an ESN for a phone that includes a phone which has been reported stolen, a fraudulently purchased phone or a phone that has been deemed as a non-payment phone. The service provider blocks that phone from being used on its network. However, if the SIM card is replaced with a new SIM card, the phone can be activated on that provider's network.

## THE INTERVIEW OF BARANGIRANA

48.   In conjunction with the execution of the search warrant, Your Affiant and SA Laurel Vant
interviewed BARANGIRANA. At the onset of the interview, Your Affiant advised
BARANGIRANA that he was not under arrest, and that he was free to go at any time.   Your
Affiant then asked BARANGIRANA if he would be willing to answer some questions related to
his eBay business.   BARANGIRANA responded "Yes".   SA Vant then advised
BARANGIRANA that he could stop answering questions at any time.

49.   BARANGIRANA stated that he lives alone in the Piper Lane residence.   He stated he has a
good understanding and comprehension of the English language.   BARANGIRANA stated that it
was okay for the agents to communicate with him in English.   BARANGIRANA stated that he
attended Sinclair Community College in Dayton, Ohio and received an Associate's Degree in
General Science.

50.   BARANGIRANA stated that in 2007 he started to sell merchandise via eBay under the name
"SAVERSVILLE."   BARANGIRANA stated that SAVERSVILLE is a sole proprietorship,
owned and operated by BARANGIRANA, and he has zero employees.   BARANGIRANA stated
that he runs the business from his residence on Piper Lane, Centerville, OH.

51.   BARANGIRANA stated that running SAVERSVILLE is his primary job, and main source of
income.

52.   BARANGIRANA stated that he posts ads on "craigslist" seeking people who are selling new
and like new electronics (mostly cellular phones, smart phones, and tablets).   BARANGIRANA
stated that after he is contacted with a prospective supplier, he arranges to meet them to check out
the merchandise they are selling. These locations include Cincinnati and Columbus. If
BARANGIRANA is satisfied on the condition of the merchandise, he will then negotiate a price,
and purchase the merchandise on the spot by paying the supplier in cash.   BARANGIRANA
stated that he always purchases his merchandise with cash.

53.   BARANGIRANA admitted that he is not an authorized dealer for any phone companies
(Sprint, Verizon, T-Mobile, Apple, Samsung or Blackberry). BARANGIRANA also stated that he
does not buy phones from major retailers such as Best Buy. BARANGIRANA stated that he
exclusively acquires his inventory in the manner described above from people off craigslist. Later
during the interview BARANGIRANA stated he does buy about 10 phones a week from a person
who runs a business out of state.

54.   BARANGIRANA stated that the majority of the merchandise he sells via SAVERSVILLE is
based on a fixed price for the item. BARANGIRANA stated that all money from the sales of
merchandise is processed through his PayPal account. BARANGIRANA admitted that his
SAVERSVILLE PayPal account is tied to a Wright Patterson Credit Union account.

55.   BARANGIRANA stated that he runs all aspects of his business from the acquisition of
inventory, to the shipping, and maintaining of business records.   BARANGIRANA stated that he

12

does not have any invoices documenting the acquisition or sale of inventory, but that he maintains an excel spreadsheet as his primary business records.

56.  BARANGIRANA stated that the large cash withdrawals from his bank accounts are for the sole purpose of purchasing cell phones from people advertising on craigslist.

57.  BARANGIRANA stated that all of his customers pay through PayPal.   Your Affiant would note that over $1,853,062.01 has been deposited in BARANGIRANA'S PayPal account.

58.  BARANGIRANA stated that all of the phones found in his residence were from craigslist purchases.

59.  BARANGIRANA stated that he does not keep a list of the persons from whom he obtains phones.   However, their phone numbers would be in his phone.

60.  BARANGIRANA stated that his income last year was $70,000.00 after expenses.

61.  During the search of the residence, agents found that there was an office and a bedroom that BARANGIRANA used for selling and shipping phones. In both the office and the shipping room, there were tons of SIM cards lying on the desk and found in the desk drawers in the office and in a container in the shipping room. Your Affiant believes that BARANGIRANA was buying and selling so many phones, that he just tossed the SIM cards that came with the phones he purchased. All of the SIM cards were collected for evidence.

62.  Throughout the course of this investigation, your Affiant has talked to multiple cell phone corporations (Sprint, Samsung and Verizon Wireless) and learned that new phones come packaged with internal storage or a new SIM card. A SIM card is a little memory card that slides into the phone. The SIM card's memory includes the phone number for the phone and other data. When a phone company sells a customer a new phone, the sales person activates the phone and may lock the phone to that provider. The person purchasing the phone then saves their settings (such as how loud to ring, the password to use the phone) and contacts to the phone's SIM card.

63.  If the phone is locked, that means that the seller of the phone has locked the phone to their network and the phone can only be used on that specific network that locked the phone.   If the SIM card on a locked phone is replaced with a new SIM card, the phone is still locked to the network. However, if the phone had also been blocked from the network because it was stolen, fraudulently obtained or was designated as a non-payment phone, the new SIM card gets past that block and can be used on that network.

64.  If the provider learns that a phone has been stolen, it will block that phone's ESN from being used on its network. However, by replacing the SIM card, that stolen phone can be used that network.

65.  New SIM cards are readily and cheaply available for purchase on the internet.

66. There are only a few reasons to replace the new SIM card that comes with the new phone with another SIM card. One reason to take the new SIM card out of a new phone is to activate the new phone under someone else's account without them knowing.

67. Another reason to take out the new SIM card that comes with the new phone is to switch the phone number on the new phone to the phone number on the replacement SIM card.

68. Your Affiant asked BARANGIRANA why there were so many SIM Cards lying around at his residence. BARANGIRANA stated that phones come with these chips in them, you take them out and throw them away, and when you sell them, the buyer puts a new SIM card into the phone. However, based on Your Affiant's understanding, it is not a standard business practice for the seller of a new, non-stolen, non-fraudulently purchased or non-payment phone to automatically take the new SIM card out of the phone and replace it with another new SIM card.

69. BARANGIRANA admitted that he has "conducted business" from GREGORY COOPER on two occasions and that COOPER supplied him some phones. BARANGIRANA stated that COOPER made stuff up about their encounter. Your Affiant believes that "made stuff up" refers to COOPER stating that BARANGIRANA calls him on the phone and gives him unknown persons' identifying information (names, social security numbers, dates of birth, and account numbers); that he is directed by BARANGIRANA to go to Sam's Club or Best Buy with the information and obtain upgrades for the person for whom he has been given identifying information; and that BARANGIRAN directs him to purchase specific phones and deliver the phones to BARANGIRANA.

70. BARANGIRANA stated that he does not knowingly buy stolen stuff, and said he uses ESNfree.com to verify if the merchandise he is buying is stolen. BARANGIRANA also stated he will call Sprint and ask if the phone is good. Also he uses checkmyesn.com.

## CONCLUSION

71. Based on the facts and circumstances presented in this Affidavit and the facts set forth in the Complaint, the Defendants are subject to civil forfeiture pursuant to:

    a. 18 U.S.C. § 981(a)(1)(C) as the Defendants constitute or are derived from proceeds traceable to a violation of 18 USC § 1028 (Fraud and Related Activity in Connection with Identification Documents, Authentication Features, and Information), 18 U.S.C. § 1028A (Aggravated Identity Theft), 18 U.S.C. §1029 (Fraud in Connection with Access Devices); or a violation of a specified unlawful activity including, 18 U.S.C. § 1956 (Money Laundering), 18 U.S.C. § 1957 (Engaging in Monetary Transactions in Property Derived from Specified Unlawful Activity), 18 U.S.C. § 1343 (Fraud by Wire, Radio or Television), or are derived from proceeds traceable to a conspiracy to commit such offense; and/or

14

      b.  18 U.S.C. § 981(a)(1)(A) as the Defendants were involved in a violation of 18 U.S.C. § 1956 (Laundering of Monetary Instruments), and 18 U.S.C. § 1957 (Engaging in Monetary Transactions in Property Derived from Specified Unlawful Activity).

FURTHER AFFIANT SAYETH NAUGHT,

                                      s/Mark Salloum
                                      Mark Salloum
                                      Special Agent
                                      Homeland Security Investigations

STATE OF OHIO                  )
                                    SS
COUNTY OF MONTGOMERY    )

      On this 10th day of June, 2014, personally appeared Mark Salloum who, being first duly sworn, upon his oath, signed the above Affidavit and Verification of Complaint.

                                        s/Pamela M. Stanek
                                      Pamela M. Stanek, Notary Public
                                      In and For the State of Ohio
                                      My Commission does not expire